IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KYLE CARLTON and PARKER　　:
FULLER,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　:　CIVIL ACTION
v.　　　　　　　　　　　　　　　:　NO. 1:16-CV-729-RWS
　　　　　　　　　　　　　　　　:
NORFOLK SOUTHERN RAILWAY　:
COMPANY,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　Defendant.　　　　　　　　　　:

## ORDER

The captioned case is before the court for consideration of defendant's motion for summary judgment [37] and defendant's motion to exclude expert testimony [28].

### I.　　Factual Background[1]

In this case, plaintiffs filed their whistleblower complaint under the Federal Railway Safety Act ("FRSA"), 49 U.S.C. § 20109, in connection with their respective terminations of employment with defendant. Plaintiff Kyle Carlton ("Carlton") was hired by defendant Norfolk Southern Railway Company ("Norfolk") in 2006 as a Bridges & Buildings ("B&B") apprentice. (Def.'s Undisputed Facts ¶ 1.) Carlton

---

[1] These are undisputed facts culled from plaintiffs' complaint, defendant's statement of undisputed material facts ("Def.'s Undisputed Facts"), plaintiffs' response thereto, plaintiffs' statement of undisputed material facts ("Pls.' Undisputed Facts"), defendant's response thereto, and various depositions and affidavits.

then moved up the ranks of B&B to become a helper, a mechanic, and finally a foreman. (*Id.*) Carlton was a foreman at the time of his first termination from employment. He had been demoted to mechanic at the time of his second termination from employment. (*Id.* at ¶ 2.) Carlton first worked for defendant at its Forrestville location and was supervised by Jim Shealy ("Shealy"). After he returned from termination Shawn Ayers ("Ayers") was his supervisor until his second termination. (*Id.* at ¶ 3.) When Carlton was a foreman, he was the Roadway Worker in Charge and, thus, responsible for track time authority, which is the authority to prevent a train from coming over a bridge on which defendant's employees are performing an inspection and/or where the employees have left one or more trucks. (*Id.* at ¶ 4.)

Fuller started working for defendant in 2007 as an apprentice in the B&B division. He became a helper in 2009, a position that he held until his termination and continues to hold after his return to employment. Fuller's supervisors have been Shealy, Ayers, and Randy Allen. (*Id.* at ¶ 5.) Fuller worked with Carlton in the B&B division. (*Id.* at ¶ 6.) Prior to 2014, neither Carlton nor Fuller had been subjected to any discipline or disciplinary charges. (Pls.' Undisputed Facts ¶¶ 5, 6.)

On August 1, 2013, Carlton and Fuller were working on a crew with Steve Whaley ("Whaley"), Allen Mull, Deon Wooten, and Ryan Weaver ("Weaver") replacing crossties in Rome, Georgia. That afternoon, Whaley started to demonstrate

signs of distress and was taken by the rest of the work crew to a hospital.  At the hospital, the crew explained to Shealy what had happened and signed a statement regarding the incident (the "Whaley Statement").  (Def.'s Undisputed Facts ¶ 7.)  The statement is an accurate representation of "how the day went."  (*Id.* at ¶ 8.)  Prior to this incident, which led Whaley to file a suit against Norfolk (the "Whaley Case"),[2] Carlton told Shealy and Terry Hickman ("Hickman"), an Assistant Division Engineer, that Whaley was not physically able to perform the job of a B&B helper.  (Carlton Dep. 74-75, 211-14.)

On May 12, 2014, Shealy asked Carlton to "get the guys and rewrite a statement on Steve's incident," allegedly claiming that he had lost the original statement and needed a new one.  (Def.'s Undisputed Facts ¶ 9.)  Shealy did not provide any instructions as to the contents of the new statement, leaving it to Carlton as to what would be included.  (*Id.* at ¶ 10.)  Carlton refused to rewrite the statement.  (*Id.* at ¶ 11.)  On May 15, 2014, he was instructed to meet with defendant's attorneys, who were investigating the Whaley Case.  At that meeting, Carlton learned that the Whaley

---

[2] On February 11, 2014, Whaley filed a complaint against defendant pursuant to the Federal Employer's Liability Act ("FELA").  *Whaley v. Norfolk Southern Ry. Co.*, Civil Case No. 4:14-cv-00108-HLM.  On June 2, 2015, Judge Murphy granted summary judgment to defendant on Whaley's claims.  Following the entry of summary judgment, defendant and Whaley agreed to a confidential settlement.  This prevented an appeal of the court's ruling.  Plaintiffs argue that the fact that prior to the Whaley incident, Carlton notified two of his superiors, Shealy and Hickman, that Whaley was physically unfit for the job as a B&B helper, if discovered during the Whaley Case, would have supported a negligent assignment claim under the FELA.

Statement was not lost but was in the possession of defendant's attorneys.  (Pls.' Undisputed Facts ¶ 14.)  On May 19, 2014, Shealy again requested of Carlton that he rewrite the Whaley Statement because it had been lost.  Carlton knew that Shealy's claim that the statement had been lost was false.  (*Id.* at ¶ 15.)  Shealy contacted Carlton two more times after May 19, 2014, requesting that the Whaley Statement be rewritten.  (*Id.* at ¶ 16.)  At no time did defendant tell Carlton what to put in the new statement.  (Def.'s Undisputed Facts ¶ 13.)

No representative of defendant individually approached Fuller to ask for a new statement or threatened him with termination or discipline for refusing to complete a second statement.  (Def.'s Undisputed Facts ¶ 15.)  However, both Carlton and Fuller believed that defendant wanted the Whaley Statement changed.  (Pls.' Undisputed Facts ¶ 17.)  Fuller did not rewrite the Whaley Statement because he was concerned about being disciplined for not being able to reproduce the same statement as his original statement.  Defendant ultimately dropped its request for a new statement and did not discipline or threaten to discipline Carlton, Fuller, or any other members of the crew for refusing to rewrite the Whaley Statement.

On June 24, 2014, plaintiffs were working on a team inspecting bridges with Hickman, Michael Waldon ("Waldon"), Casey Cowart, and Jody Cowart.  Hickman, the senior company officer in charge of the work, performed a job briefing at the

Donahoo Road crossing prior to trucks' being placed on the rail.  (Pls.' Undisputed Facts ¶¶ 2, 3, 25.)  The job briefing consisted of Hickman's instructing the crew that they would be using two high-rail trucks (trucks that can attach to rails).  Hickman also instructed the crew that if they were able to obtain track time, they would work south inspecting bridges.  (*Id.* at ¶ 26.)  After obtaining track time, the crew parked the two trucks near a bridge that they were inspecting.  (Def.'s Undisputed Facts ¶ 18.)

As Roadway Worker in Charge, Carlton was responsible for track time authority.  (*Id.* at ¶ 19.)  After Carlton informed Hickman that the track time was about to expire, Hickman asked Carlton to obtain more track time.  (*Id.* at ¶ 20.)  After Carlton informed Hickman that he could not obtain more track time, Hickman decided to stay at the bridge with Waldon and the Cowarts.  Hickman testified that at this time, he told Carlton and Fuller to take the trucks off the bridge.  (Pls.' Undisputed Facts ¶ 34.)  However, Carlton and Fuller stated that Hickman told them to remove only one truck from the track.[3]  (*Id.* at ¶ 33.)  After Carlton and Fuller removed one of the

---

[3] Neither Carlton nor Fuller claimed in their post-incident written statements that Hickman had told either of them to remove only one truck from the track.  (Def.'s Mot. for Summ. J. Exs. C, D.)  Waldon and both of the Cowarts stated in their post-incident statements that they heard Hickman ask Carlton and Fuller to remove both trucks from the tracks.  (Def.'s Mot. for Summ. J. Exs. E, F, G.)  For example, Waldon stated in part:

> Terry asked Kyle and Parker to take the trucks to the crossing and give up his track time.  That we were going to continue our inspection and come back and pick us up after he got more track time.

(*Id.* at Ex E.)

trucks, Carlton "gave up track time with the dispatcher." (Carlton Dep. 90.) Once

track time is given up, the dispatcher has authority to let a train come through. (*Id.*)

After doing so, Carlton realized that one of the trucks was still on the track. Carlton

testified:

> When I - - when I realized the other truck was still there, that nobody
> else had driven it out, I called the dispatcher right then and told him to
> stop the train. And, of course, it's on the recording, you can hear me tell
> him to stop the train, that a piece of high rail equipment was left on the
> track. So we finally get in touch with Terry or Mike Waldon, one of
> them, and tell them what was going on. So when they come up to the
> railroad crossing, we're trying to take this truck off and it's the old style
> truck and we could not get it to lift off the rail. And being it was their
> truck, obviously, they was familiar with it, we weren't. And then by the
> time they got done messing with that truck trying to get it off the track
> because it was not operating right, the train - - the gates dropped and we
> heard the train coming. And we got the truck off and then the train come
> by at like walk speed.

(*Id.* at 93.)

After the incident, Carlton and Fuller both signed statements. (Def.'s

Undisputed Facts ¶ 25.) Carlton stated:

> Got track time then had a job briefing to let everyone know what the
> track authority was and our limits. Terry, Jody and I headed south to go
> and talk to Ryan and the welder @ the 88-7 H. Ryan had a question
> about where to weld a certain part of the bridge. Parker, Casey, and
> Michael headed north to start inspecting bridges. When we were done
> @ the 88-7 H we made contact with Parker and he said they were at the
> 87-2 H and were inspecting it. We backed up to where they were and
> started checking the bridge out. It was getting close to the end of our
> time, and Terry wanted me to to get in touch with the dispatcher to see
> if we could get more track time. The dispatcher told me he had to get

one train by us then he could give us more time.  Told Terry what he said, and he told us to go clear up.  We took the truck off @ Donahoo Rd crossing and I proceeded to clear our track authority.  After clearing up I sat in the truck for a couple of minutes and realized the other truck was on the track.  I get out of the truck and told Parker what was going on while I was trying to call Terry on his phone.  Parker was toning the dispatcher while I tried Michael's phone.  He didn't answer.  I get back in gang truck and called dispatcher on phone and got him to answer.  I asked him if a train was in the block.  He said there was north of Brice.  I told him to stop the train.  Then Michael called me.  I told him I had a train stopped.  They got to the crossing.  We were taking the truck off and the gates came down.  I looked south and seen a train creeping around the curve.  Got the truck off to the side.

(Def.'s Mot. for Summ. J. Ex. C.)  In addition, Fuller stated:

> We were issued a track authority at    pm.  We discussed that Terry, Kyle, and Jody were going to talk to Ryan & the welder.  Me, Michael, & Casey were going to the concrete bridge at the 87 mile post.  When Terry & his group was finished they were coming to meet us.  By the time they arrived we were at the 81.2 inspecting underneath the bridge.  It was getting close to our clear up time & Terry told Kyle & I to go clear up.  We got off at Donahoo Road crossing & cleared up.  After a minute Kyle remembered we still had a truck on the track & started calling & toning the dispatcher.  When he finally answered Kyle told the dispatcher to stop the train.  Kyle then called Terry & Michael Waldon with no answer.  Michael called Kyle back & Kyle told him to get the little truck off the track.  They got to the crossing & started taking the truck off & got it off just as the train was coming around the corner.

(*Id.* at Ex. D.)

Based on his investigation, Division Engineer Brent Emerson ("Emerson") charged Carlton and Fuller with rules violation and removed them from service pending investigation.  His interviews at the scene revealed that Hickman had asked

Carlton to remove both trucks, that Carlton had failed to do so before releasing track

authority, and that Carlton compounded the mistake by telling the rest of the crew that

the train in the area was stopped when he had not been told by the dispatcher that this

was the case.  (Def.'s Undisputed Facts ¶ 29.)  Emerson stated in part:

> Mr. Hickman instructed Mr. Fuller to go with Mr. Carlton to assist in clearing both trucks.  He told Mr. Fuller they would stay and continue their inspection under traffic and wait for them to return on a new track authority. . . . Mr. Carlton and Mr. Fuller made a facing move in the South direction towards Donahoo Road to set the truck off and clear up the track authority.  They did not check the mirrors and left the 208644 [truck] sitting at the MP 87.2 H bridge.  The other four employees were under the bridge still performing the inspection.  Mr. Carlton cleared Track Authority 1022 up with the dispatcher at 1:44 pm.  Shortly after clearing TA 1022 with the dispatcher, Mr. Carlton realized the mistake of leaving the 208644 truck on the track.  He called the dispatcher using his cell phone.  Mr. Carlton instructed the dispatcher to not let a train come into the block between Finley and Brice.  The dispatcher responded by stating that a train was already coming up there now.  Mr. Carlton told the dispatcher to stop the train.
>
> . . .
>
> Cause of Incident:
> The work group failed to remove both trucks from the track before clearing Track Authority 1022, leaving 208644 [truck] on the track unprotected for approximately 8 minutes.  The [Roadway Worker in Charge] failed to ensure that all on-track equipment was clear before releasing limits to the control operator.  The situation was compounded by a poor decision of the group to bring the truck, that was left on the track, to Donahoo Road to clear up which resulted in a near miss situation with a train.

8

(Def.'s Mot. for Summ. J. Ex. H.)  Hickman did not play any role in the decision to charge plaintiffs.  (Def.'s Undisputed Facts ¶ 30.)

In a June 30, 2014 charge letter, Emerson informed Carlton that he was being held out of service pending "a formal investigation to determine [his] responsibility, if any, in connection with improper performance of duty as Foreman and Roadway Worker in Charge."  The letter alleged:

> 1.  You failed to ensure that all equipment was clear of the track before you released Track Authority No. 1022.  This left Company Vehicle No. 208644 unprotected on the track.
> 2.  You also failed to give proper instructions to your work group and incorrectly informed them that NS Train 735 was stopped and that they could move Company Vehicle No. 208644 from the track onto Donahoo Road, when in fact the train was moving and they drove the truck into the path of the oncoming train, resulting in a near miss with the train.

(Def.'s Mot. for Summ. J. Ex. I.)

Emerson also sent a charge letter to Fuller on June 30, 2014, stating that he was being held out of service pending "a formal investigation to determine [his] responsibility, if any, in connection with improper performance of duty . . . in that [he] failed to ensure that all equipment was clear of the track before Track Authority No. 1022 was released."  (*Id.* at Ex. J.)

In these letters, Emerson informed Carlton and Fuller of their procedural rights at the hearing as follows:

> At the hearing, you shall have the right to be represented by an employee or organization representative(s) of your own choosing in accordance with your working agreement.  You and your representatives shall have the right to introduce witnesses in your behalf, to hear all testimony introduced, and to question all witnesses.  If you desire any other witnesses who may provide material facts, please furnish their names as soon as possible and make arrangements for their presence at the above location.

(*Id.*)

On July 31, 2014, Division Engineer Shane Thomason ("Thomason") conducted the hearing on the charges against Carlton and Fuller.  At the hearing, Carlton and Fuller were represented by Samuel Alexander ("Alexander")[4] and Marcus Hood ("Hood") from their union, the Brotherhood of Maintenance of Way Employees ("BMWE") Division of the International Brotherhood of Teamsters.  (Def.'s Undisputed Facts ¶ 34.)  As the hearing officer, Thomason's role was to understand the matter being investigated; review the transcript and exhibits; determine if the charge has been proven; and, if so, assess discipline.  (*Id.* at ¶ 35.)  At the time, Thomason was the Division Engineer for Norfolk's Central Division, which borders but does not include the Georgia Division.  (*Id.* at ¶ 36.)  Thomason, as a company

---

[4]  Alexander is the General Chairman of the BMWE, which is the union recognized to represent members of the engineering/maintenance of way craft.  Alexander's job is to handle claims for members of the union and negotiate on their behalf.  Alexander also advises union members of the terms of the collective bargaining agreement.  (Pls.' Undisputed Facts ¶ 7.)  Alexander keeps records of all discipline cases in his division.  (*Id.* at ¶ 9.)  Prior to becoming a union officer, Alexander worked as an employee for defendant's predecessor in interest from 1979 to 1990.  (*Id.* at ¶ 8.)

officer of defendant, has the ability to charge employees with rule violations.  (Pls.'
Undisputed Facts ¶ 2.)

At the hearing, Emerson, in his role as the charging officer, played a pair of
recordings between Carlton and a dispatcher.  The first reflected Carlton's releasing
track time authority.  The second reflected that the train was going to stop short of
Finley, after which Carlton said, "stop him there," but that Carlton did not receive
confirmation from the dispatcher that this had been or would be done.  (Def.'s
Undisputed Facts ¶ 37.)  At the hearing, Carlton stated that there was no discussion
between Fuller and him as to what they would do with the second truck while they
were removing the first truck from the track.  Carlton stated, "I never looked up, never
looked in the mirror, just, just headed to the crossing." (*Id.* at ¶ 38.)  Carlton admitted
that it never registered with him that there were two trucks on the tracks.  (*Id.*)
Carlton stated that when he realized what had happened, "I told Parker, I said man, we
left that other truck on the track." (*Id.* at ¶ 39.)  Carlton admitted that the dispatcher
never told him that the train in the vicinity had stopped.  (*Id.* at ¶ 40.)  When asked
about the fact that he did not express a sense of urgency to the dispatcher about there
being equipment on the track after track authority had been released, Carlton
responded:  "[Y]ou know, so, probably just, I'll be honest with you, I was pretty
upset." (*Id.* at ¶ 41.)  When asked if he "fulfilled [his] duties as a Roadway Worker

in Charge leaving the 208644 on the rail," Carlton replied: "No, Sir.  I messed up." (Def.'s Mot. for Summ. J. Ex. K 87.)  Fuller admitted that it never crossed his mind that there was a second truck on the tracks.  (Def.'s Undisputed Facts ¶ 45.)

After the hearing, Thomason discharged Carlton and Fuller based on the evidence he had heard and the exhibits he reviewed.  (*Id.* at ¶ 47.)  Carlton was replaced by Weaver after Carlton was "sent home" following the track time incident. (*Id.* at ¶ 49.)  At the time of the hearing, Thomason was not aware that Carlton and Fuller had refused to provide a second statement in the Whaley Case.  (*Id.* at ¶ 50.) The issue of Carlton's and Fuller's refusing to provide second statements in the Whaley Case never came up at the hearing regarding their track time violations.  (*Id.* at ¶ 51.)

On October 3, 2014, Carlton and Fuller were reinstated without backpay under an agreement between their union and Norfolk's Labor Relations Department.  (*Id.* at ¶ 55.)  Since being reinstated, Fuller has worked for Norfolk in the same position and pay and does not believe that he has been retaliated against or suffered any unfair actions since returning.  (*Id.* at ¶ 56.)  Fuller would have no issue with reporting a workplace injury or safety concern to Norfolk.  Fuller never felt that he could not report safety issues to his direct supervisors.  (*Id.* at ¶ 57.)

On February 12, 2015, while reversing a company truck, Carlton lost sight of Weaver - the ground man (or flagman) who was directing his movements - and dented a private pickup truck.  (*Id.* at ¶ 58.)  Norfolk employee Mike Chatman ("Chatman") observed the incident and signed a written statement setting forth that he saw Carlton reverse the truck towards a Chevrolet truck while a flagman on the ground was waving his arms and yelling stop.  Carlton does not dispute Chatman's description. (*Id.* at ¶ 59.)  In a February 23, 2015 charge letter, Emerson informed Carlton, among other things:

> You are [being held out of service pending] a formal investigation to determine your responsibility, if any, in connection with the following:
>
> 1) Improper performance of duty and failure to work safely in that while operating Company Section Truck No. 209605 at approximately 8:00 a.m.on February 12, 2015, on the right of way of the South End of the Forrestville Yard in Rome, Georgia, you attempted to perform a 3-point turn and failed to stop the vehicle after losing sight of your ground man, creating a dangerous work situation.
> 2) Improper performance of duty in that while operating Company Section Truck No. 209605 at approximately 8:00 a.m. on February 12, 2015 . . . upon re-establishing line of site with your ground man, you failed to follow the stop signals he provided and impacted a private vehicle.  This resulted in damage to the private vehicle.

(Def.'s Mot. for Summ. J. Ex. Q.)

On March 4, 2015, Thomason conducted the hearing regarding the charges against Carlton.   At the hearing, Carlton was represented by Rick Chambers

13

("Chambers") and Hood from BMWE.  (Def.'s Undisputed Facts ¶ 62.)  At the

hearing, Weaver described the incident as follows:

> But, anyway, we pulled back down to the office.  I said, I'll get out and
> back you up.  And got out, started waving him back.  Backed up
> probably to the tracks, or over them maybe, and I swapped sides, and
> maybe waved him back, I don't know how much more, I mean, as far as
> feet-wise, so maybe 10 feet more, and then tried to stop him.  And I
> don't guess he seen me, and he was getting closer and closer and wasn't
> stopping, so I was - - started hollering and waving my arms and jumping
> up and down, and hit the black truck.

(*Id.* at ¶ 63.)  Carlton claimed at the hearing that he lost sight of Weaver because he

was also making sure that the truck did not hit a vehicle to the front.  (*Id.* at ¶ 64.)

Carlton admitted that he never saw the private vehicle that he hit. (*Id.* at ¶ 65.)

Carlton further admitted that it was his responsibility to stop if he lost track of his

flagman and that it was possible that he could have run over his flagman.  He also

admitted that he would not have hit the private vehicle if he had stopped after losing

sight of his ground man.  (*Id.* at ¶ 66.)  Carlton additionally admitted that failing to

stop the vehicle after losing sight of his ground man created a dangerous work

situation.  (*Id.* at ¶ 67.)  After the hearing, Thomason discharged Carlton.

At the time of this hearing, Thomason was unaware that Carlton had refused to

provide a second statement in the Whaley Case.  (Def.'s Undisputed Facts ¶ 70.)  The

issue of Carlton's refusing to provide a second statement in the Whaley Case never

arose at the hearing regarding his vehicle violation.  (*Id.* at ¶ 76.)  Alexander asked for

a waiver from the disciplinary charges against Carlton.  (Pls.' Undisputed Facts ¶ 61.)

Carlton was denied a waiver for either the June 2014 incident or the February 2015

incident.  (*Id.* at ¶ 60.)

On December 21, 2014, Carlton and Fuller filed their FRSA whistleblower

complaints with the Occupational Safety and Health Administration ("OSHA")

claiming that their respective employment was terminated for their refusal to rewrite

their statements in the Whaley Case and not because of their track time violations.

(Pls.' Undisputed Facts ¶ 46.)  In a letter to OSHA dated May 21, 2015, plaintiffs'

counsel discussed Carlton's termination for the vehicle incident.  (Pls.' Resp. to Def.'s

Undisputed Facts Ex. G.)   OSHA and counsel for defendant received notice of

Carlton's claims for violations of the whistleblower law on May 22, 2015.  (Pls.'

Undisputed Facts ¶ 74.)  On March 7, 2016, plaintiffs filed their FRSA complaint in

this case.

## II.   Legal Analysis

### A.   Motion for Summary Judgment.

Summary judgment shall be granted when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(c)(2).  Only those claims for which there is no need for a factual

determination and for which there is a clear legal basis are properly disposed of through summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

It is well settled that a court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. *See, e.g.*, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986), *reh'g denied*, 815 F.2d 66 (11th Cir. 1987). To survive a motion for summary judgment, the non-moving party need only present evidence from which the trier of fact might return a verdict in his favor. *Samples*, 846 F.2d at 1330. However, Rule 56, "[b]y its very terms, . . . provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The materiality of facts is governed by the relevant substantive law in the case. *Id.* at 248. A dispute is genuine if the evidence is such that the factual issues "may reasonably be resolved in favor of either party." *Id.* at 250.

Consideration of a summary judgment motion does not lessen the burden on the non-moving party. The non-moving party still bears the burden of coming forth with sufficient evidence. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). "If the non-movant in a summary judgment action fails to adduce

evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) (citation omitted).

The FRSA prohibits a railroad carrier from retaliating against an employee for, among other things, reporting a work-related injury or providing information regarding a possible violation of the law. The Act states, in relevant part:

> (a) In general.--A railroad carrier engaged in interstate or foreign commerce, a contractor or a subcontractor of such a railroad carrier, or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done--
>
> (1) to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security . . . .
> (2) to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security . . . [or]
>
> (4) to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee[.]

49 U.S.C. § 20109 (a)(1), (2), (4).

"The FRSA incorporates by reference the rules and procedures applicable to Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") whistleblower cases." *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013). *Id.* at § 20109(d)(2)(A). AIR–21 sets forth a two-part burden-shifting test for employees to establish a retaliation claim. 49 U.S.C. § 42121(b)(2)(B)(i)-(ii) states:

> (i) Required showing by complainant.--The Secretary of Labor shall dismiss a complaint filed under this subsection and shall not conduct an investigation otherwise required under subparagraph (A) unless the complainant makes a prima facie showing that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.

> (ii) Showing by employer.--Notwithstanding a finding by the Secretary that the complainant has made the showing required under clause (i), no investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

49 U.S.C.A. § 42121(b)(2)(B)(i)-(ii).

Under this framework, "an employee must show, by a preponderance of the evidence, that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Araujo*, 708 F.3d 152 at 157 (internal quotation and citation omitted). "The plaintiff-

employee need only show that his protected activity was a 'contributing factor' in the retaliatory discharge or discrimination, not the sole or even predominant cause. . . . In other words, a contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Id.* at 158. "Once the plaintiff makes a showing that the protected activity was a 'contributing factor' to the adverse employment action, the burden shifts to the employer to demonstrate 'by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.'" *Id.* at 157.

In its motion, defendant asserts that plaintiffs cannot state a prima facie claim for retaliation because plaintiffs did not engage in protected activity.  Plaintiffs allege that their refusal to rewrite the Whaley Statement constitutes protected activity.  As specifically set forth above, the FRSA protects employees who provide information in an investigation, refuse to assist in violation of a rule, or notify the carrier of work-related injuries.  49 U.S.C. § 20109 (a)(1), (2), (4).  The court finds that the refusal to rewrite the Whaley Statement does not fall within the scope of FRSA's protection because it is not "provid[ing] information . . . or otherwise directly assist[ing] in any investigation."  49 U.S.C. § 20109 (a)(1).  In addition, defendant's asking plaintiffs to rewrite the Whaley Statement without more is not a violation of any federal law, rule, or regulation.  *See* 49 U.S.C. § 20109 (a)(2).  Finally, plaintiffs were not

notifying or attempting to notify defendant of a work-related personal injury or illness.

*See* 49 U.S.C. § 20109 (a)(4).

While plaintiffs could theoretically state a claim that they engaged in protected activity if defendant had pressured them to change their stories and they refused, the testimony is clear that this was not the case.  More specifically, Carlton testified:

> Q: Okay.  So when was the first time that Mr. Shealy asked you to fill out a new statement?
> A: May 12, 2014.
> . . . .
>
> Q: Okay.  Did he say anything other than that?
> A: No.
> Q: He didn't tell you what to put in there?
> A: No.
> Q: Didn't tell you he wanted more details?
> A:  No.
> Q: He just left it up to you, correct?
> A: Yes.
> . . . .
>
> Q: What did you say back to Mr. Shealy?
> A: Well, the following week, after he had already asked me several more times, I finally just told him I wasn't going to rewrite it, that I'd already talked to the Union reps and they advised me not to rewrite anything.
> . . . .
>
> Q: How many times did [Shealy] ask you for a new statement?
> A: Four times.
> . . . .
>
> Q: At no time did anyone at Norfolk Southern tell you what to put in a new statement, did they?
> A: No.

Q: And at no time did they ever say they wanted more details or less details or anything like that, right?
A: No.
Q: They entirely left it up to you in terms of what was going to go into the statement, right?
A: Yes.
Q: You and the rest of the group, right?
A: Yeah.
Q: Okay.  I want to make sure that the record's clear.  Norfolk Southern did not tell you what needed to go in the statement - -
A: No.

. . .

Q: So at no time was Norfolk Southern pressuring you for a certain version of the facts, correct?

. . . .

A: Yeah, he was pressuring me.  He never told me what to put in it, but he was calling me and always asking about wanting a new rewritten statement on Steve.
Q: But he wasn't pressuring you in terms of the content - -
A: No.

(Carlton Dep. 68, 70-73.)  In addition, Fuller testified:

Q: Did Mr. Carlton convey to you that Norfolk Southern wanted anything changed about the statement?
A: No, sir.
Q: So far as you knew, Norfolk Southern would have been fine with the exact same content . . . in a new same statement?

. . . .

A: We were afraid we couldn't duplicate that same copy.  Because it had been months later.
Q:  So - - so your concern was your memories aren't as fresh, so you won't be able to put the same details down in May of 2014 as you would have been able to in August of 2013, correct?
A: That's correct.

Q: Okay.  Did you feel like Norfolk Southern was trying to get you to change your story?

A: I really didn't know at that point.

Q: Did you feel at any point like Norfolk Southern wanted you to change your story?

A: I - - I think they may have wanted some stuff left out.

Q: What do you think they wanted left out?

A: Just the - - the fact that he had been having problems.  They - - maybe before - - beforehand when he got hurt - - I mean before he asked to go to the hospital.

Q: So - - so let me know which specific language in the statement you believe Norfolk Southern wanted removed?

. . . .

A: I don't know specifically.

Q: Upon what do you base your opinion that Norfolk Southern wanted some detail from this statement removed?

A: I think it was because they - - they had known about his condition.  They knew he wasn't - - he wasn't cut out for it and let him keep going out there and do that kind of work.

Q: Okay.  But where in the statement does it reflect that Norfolk Southern knew about Mr. Whaley's condition prior to August 1, 2013?

A: It doesn't.

Q: So that wouldn't really be a reason for them to want you to change the statement, is it?

. . . .

A: I don't know.

Q: Do you have any other reason to believe that Norfolk Southern wanted changes to this statement other than the fact that you believe that some of them knew about Whaley's condition prior to August 1, 2013?

A: No, sir.

Q: Okay.  Did anybody at Norfolk Southern specifically tell you they wanted you to change the content of what is in this statement that is Exhibit 2?

A: No, sir.

(Fuller Dep. 70-73.)

Although defendant repeatedly asked for a new statement, it is undisputed that defendant never asked plaintiffs to change their version of the events in the Whaley Case or to provide testimony that was more favorable to defendant. Plaintiffs could have provided new statements that were significantly less favorable to defendant. In addition, plaintiffs have not explained how the Whaley Statements could have been changed to favor defendant in the Whaley Case. Plaintiffs argue that defendant's knowledge of Whaley's condition before the incident could have helped Whaley in the Whaley Case. In this regard, Fuller testified that he thought that defendant "may have wanted some stuff left out" but conceded that his statement does not "reflect that [defendant] knew about Mr. Whaley's condition prior to August 1, 2013." (*Id.* at 73.) Fuller could not describe anything that he believed defendant wanted omitted. Defendant states that plaintiffs were asked to provide an additional written statement about the Whaley incident because they were eye-witnesses to the event. Plaintiffs' argument that they felt that defendant wanted the Whaley Statement changed is not supported by facts. Without more, plaintiffs' refusal to provide the rewritten statement does not constitute protected activity.[5]

---

[5] Plaintiffs argue that their filing an OSHA charge constituted protected activity. The court notes, however, that this charge was filed after plaintiffs were terminated and could not have been a factor in defendant's decision to terminate plaintiffs.

Even if plaintiffs had engaged in protected activity, their retaliation claim fails because the decision-maker for their terminations was unaware of their refusal to rewrite the Whaley Statement.  It is not disputed that Thomason was the sole decision-maker for all employment decisions at issue.  Plaintiffs admit that at the time of the decisions at issue, Thomason was unaware that plaintiffs had refused to rewrite the Whaley Statement.[6] (Def.'s Undisputed Facts ¶¶ 50, 69.)  Thomason was the Division Engineer for defendant's Central Division, which does not include Georgia.  As such, he was outside of plaintiffs' chain of command and did not know who they were.  In addition, plaintiffs' refusal to rewrite the Whaley Statement never came up at either of the hearings that led to their terminations.

As plaintiffs correctly point out, "[t]o permit an employer to simply bring in a manager to be the 'sole decisionmaker' for the purpose of terminating a complainant would eviscerate the protection afforded to employees by [the Act]."  *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1378 (N.D. Ga. 2004).  The issue is not who the decision-maker was but whether the decision-maker was aware of the protected activity.  In *Collins*, the court held that defendant knew of plaintiff's

---

[6] Plaintiffs deny that Emerson, the charging officer at both hearings and not a decision-maker, was also unaware that plaintiffs had refused to sign second statements in the Whaley Case, but their sole basis for doing so is Carlton's assumption that Emerson was aware because he was Shealy's boss.  (Carlton Dep. 124-25.)  Plaintiffs' unsupported speculation is insufficient to contradict Emerson's sworn affidavit that he was unaware of plaintiffs' refusing to complete a second statement.  (Emerson Decl. ¶¶ 5, 7.)

protected activity because the manager brought in to be the decision-maker had "discuss[ed] with [plaintiff's supervisors about plaintiff,] including [her] series of complaints." *Id.* Here, plaintiffs have not alleged that Thomason had any discussion of the Whaley Statement with anyone. Plaintiffs have not pointed to a single manager who purportedly influenced Thomason's decisions.

The decision-maker's knowledge "may be established through a wide range of circumstantial evidence, including the acts or knowledge of a combination of individuals involved in the decision-making process." *Rudolph v. Nat'l R. R. Passenger Corp.*, ARB Case No. 11-037, 2013 WL 1385560, at *11 (U.S. Dept. of Labor Mar. 29, 2013) (holding that "focus on the [decision-maker]'s knowledge ignored the fact that in each instance one or more company officials who were aware of [the plaintiff]'s protected activity advised the decision-maker or were otherwise involved in the decision-making process"). Importantly, "[t]he 'knowledge' relevant for a retaliation claim under the FRSA must be tied to the decision-maker involved in the unfavorable personnel action." *Conrad v. CSX Transportation, Inc.*, 824 F.3d 103, 108 (4th Cir. 2016). Plaintiffs have failed to show that such knowledge existed here. "To the extent [plaintiffs] mean to suggest that summary judgment should be denied to [defendant] on mere speculation that a jury might arbitrarily disbelieve [Thomason]'s testimony, [the court must] reject such a suggestion." *Rudolph*, ARB

Case No. 11-037, 2013 WL 1385560, at *11.  Accordingly, plaintiffs have failed to generate a genuine dispute of material fact as to the knowledge element of their retaliation claim.  *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (affirming district court's grant of summary judgment where the decision-maker had no knowledge, actual or constructive, of the complainant's protected activity).

Defendant next asserts that plaintiffs' alleged protected activity was not a factor in their terminations.  Defendant states that it discharged plaintiffs in 2014 because they committed a serious track time violation.  Carlton acknowledged that he was not supposed to give up track time until both trucks had been moved off the track.  (Def.'s Undisputed Facts ¶ 22.)  At the hearing, Carlton admitted to his culpability for this incident.  When asked if he "fulfilled [his] duties as a Roadway Worker in Charge leaving the 208644 on the rail," Carlton replied:  "No, Sir.  I messed up."  (Def.'s Mot. for Summ. J. Ex. K 87.)  At his deposition, Fuller admitted his part in the mistake of not removing the second truck before releasing the track time:

> Q: Okay.  What mistake did you make?
>
> . . . .
>
> A: Leaving the truck on the track.
>
> . . . .
>
> Q: What mistake do you believe Mr. Carlton made?
> A: He followed an order.
> Q: And what order was that?
> A: To take a truck off the track.

Q: Meaning to take one and - - and not both?
A: Yes, sir.

. . . .

Q:  Is it your belief that Mr. Carlton should have taken both trucks off the track?

. . .

A: I think it was everybody's responsibility.
Q: Okay.  Including Mr. Carlton's?
A: Yes, sir.
Q: Okay.  Was it also a mistake to release track authority, while there was still a truck on the track?

. . . .

A: Yes, sir.
Q: Okay.  And who made that mistake?
A: Terry Hickman.
Q: Anyone else?
A: Everyone.

(Fuller Dep. 135-37.)

Thomason testified that he made the decision to discharge Carlton and Fuller based on the facts that: (1) Carlton and Fuller committed a roadway worker protection violation, which is one of the most serious violations at Norfolk; (2) they released track time with a truck on the track; (3) Carlton made a mistake with respect to the direction of the coming train and did not convey the seriousness of the situation to the dispatcher; (4) Carlton told the work group to bring their truck to the crossing shortly before a train came through; and (5) Carlton admitted that "we just screwed up." (Def.'s Undisputed Facts ¶ 48.)  Thomason's reasons for his decision to discharge

27

Carlton and Fuller are supported by undisputed facts in the record.  In addition, as it is undisputed that Thomason was not aware of the facts in connection with the Whaley Statement, those facts could not have been a factor in his determination.

Defendant then states that it discharged Carlton a second time when he reversed a company truck into a private vehicle while having lost sight of his flagman, who was signaling him to stop.  Carlton admits to these facts as well.  More specifically, Carlton admitted that he never saw the private vehicle that he hit, it was his responsibility to stop if he lost track of his flagman, it was possible that he could have run over his flagman, he would not have hit the private vehicle if he had stopped after losing sight of his ground man, and failing to stop the vehicle after losing sight of his ground man created a dangerous work situation.  (*Id.* at ¶¶ 65-67.)

Thomason testified that he made the decision to discharge Carlton a second time based on the following facts: (1) Carlton created a dangerous work situation by losing sight of his flagman and continuing to back up; (2) Carlton kept backing up even as the flagman was waving for him to stop (a fact corroborated by another witness); (3) Carlton admitted that he could have run over his flagman; and (4) the vehicle incident was Carlton's second recent endangerment situation.  (*Id.* at ¶ 68.) Thomason's reasons for his decision to discharge Carlton a second time are supported by undisputed facts in the record.  In addition, since it is undisputed that Thomason

was not aware of the facts in connection with the Whaley Statement, those facts could not have been a factor in his determination.

Furthermore, the record shows that defendant could not have intended to retaliate against its employees for refusing to sign second statements regarding the Whaley incident because another employee who had engaged in the same alleged protected activity was not disciplined by defendant in either incident.  It is not disputed that Weaver, who refused to sign a second statement regarding the Whaley incident, replaced Carlton when Carlton was fired after the track time incident. Weaver also is the employee whom Carlton endangered during the vehicle accident and whose account Thomason credited at the hearing in Carlton's rules violations.[7]

---

[7] In this regard, Carlton stated at his deposition:

Q: Now Mr. Weaver was one of the people who refused to fill out a new [Whaley] statement, right?
A: Yeah, he was one of the guys that - - he was - - you know, he's on my crew.  All of them said they wouldn't rewrite it.
Q: Okay.  And Mr. Weaver was, in fact, involved in the incident that led to your last termination, correct, the incident where you backed into a private vehicle?
A: Yes.
Q: Okay.  And, in fact, he was the one sort of testifying against you, right - -
. . . .

Q:  - - for the 2015 vehicle incident?
A: He write a report on it, yeah, and, yeah, the hearing, yes.
Q: Okay.  So it would be fair to say that Norfolk Southern sided with him over you when they ultimately fired you in early 2015, correct?
. . . .

A: Yeah, I mean, he didn't get sent home and I did.
Q: And you feel like he should have been sent home, right?

Carlton then contends that he was terminated the second time in retaliation for his refusal to sign a second statement in the Whaley Case because many other employees have been involved in vehicle accidents without being terminated. Carlton argues that over 30 other employees who caused damage to another vehicle while operating one of defendant's vehicles were not dismissed. Several of these individuals either were not charged or were granted waivers in lieu of a disciplinary hearing. Carlton asserts that the discipline assessed to Carlton by Thomason was excessively harsh. In response, defendant points out that of the 40 individuals identified by Alexander as potential comparators, only a tiny portion: (1) damaged another vehicle, (2) while endangering a co-worker, (3) mere months after committing another serious violation, or (4) were disciplined by Thomason. (Kirby Decl. ¶¶ 3, 5, 6, 8, 10.) None of the 40 combine all four factors or even come close to doing so. Defendant asserts that it has discharged every employee who committed offenses similar to those committed by plaintiffs. (*Id.* at ¶ 3.)

Plaintiffs do not dispute the fact that they must show "nearly identical" conduct on the part of their comparators. *See Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d

---

A: Yeah, I feel like it. He was the one on the ground backing me.
Q: So you feel like he was responsible for the incident where your car - - sorry, where you backed a company truck into a private vehicle, correct?
A: I'd say he was equally as responsible as me.

(Carlton Dep. 78-79.)

1319, 1323 (11th Cir. 2006).  Further, plaintiffs do not refute defendant's explanation as to why the facts surrounding Carlton's second termination were wholly different from those of the numerous ostensible comparators.  Instead, plaintiffs argue that defendant cannot use the record material attached to the declaration of Dennis Kerby, which was submitted in support of its argument, because defendant failed to produce this material during the discovery period.  If the material at issue was unavailable to plaintiffs until defendant filed Kerby's declaration,[8] plaintiffs could have filed a motion under Federal Rule of Civil Procedure 56(d)[9] requesting more time or discovery to address the material at issue.  Plaintiffs did not do so.  Plaintiffs have failed to show a genuine issue of material fact.

---

[8] Defendant states that it listed Kerby as a witness for both of the incidents at issue in this matter.  In addition, defendant asserts that in a seven-month discovery period, plaintiffs never propounded a request that would have led to the production of the documents regarding alleged comparators.  Their only requests covering the subject of comparators were Request Nos. 31 and 32 from Carlton and Request No. 26 from Fuller, which ask for "employees working in the same craft as the Plaintiff and covered by the same collective bargaining agreement who were dismissed for the same rule violations for which plaintiff was charged."  (Def.'s Reply to Summ. J. Mot. Exs. D, E.) Defendant states that it produced documents responsive to these requests.  Defendant asserts that it was not under any obligation to produce additional documents regarding the 40 individuals because they are not employees who were dismissed for the same rules violations.  Finally, defendant points out that it produced its list of comparators in August 2016, and plaintiffs never sought supplementation.

[9] Federal Rule of Civil Procedure 56(d) provides, in part: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it . . . [or] allow time to obtain affidavit or declarations or to take discovery."

For all the reasons set forth above, plaintiffs have failed to demonstrate, by a preponderance of the evidence, three of the four prongs of the FRSA's prima facie test.   Accordingly, the court hereby grants defendant's motion for summary judgment.[10]

## B.      Motion to Exclude Expert Testimony.

Defendant moves to exclude all testimony and reports by plaintiffs' proffered experts, Dr. G. Richard Thompson ("Thompson") and Lawrence Mann ("Mann").  In determining the admissibility of an expert's proffered testimony, Federal Rule of Evidence 702 requires the court to determine if the proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed.R.Evid. 702(a).  Although Federal Rule of Evidence 704 "abolishes the per se rule against testimony regarding ultimate issues of fact . . . . courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law."  *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir.1977).[11]

---

[10]  In view of this holding, the court need not address defendant's additional grounds for dismissal.

[11]  The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

Mann's curriculum vitae indicates that he is an expert in the federal railroad safety laws and regulations and, among other things, was "involved in the drafting of the railroad whistleblower law, codified at 49 U.S.C. § 20109" upon which plaintiffs bring their claims in this matter.  (Def.'s Mot. to Exclude Ex. H ¶ 8) Mann opines, without any citation to the facts upon which he bases his conclusions,[12] that "[i]t is my opinion that the Norfolk Southern Railroad violated the whistleblower law."  (*Id.* at ¶ 10.)  The court finds that such legal conclusion is an improper subject of expert testimony.  *See Cook ex rel. Est. of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (noting that "testifying experts may not offer legal conclusions").  In addition, Thompson's testimony goes to the "[e]conomic analysis of the present value of the future earnings of [Carlton]."  (Def.'s Mot. to Exclude Ex. G.)  In light of this court's conclusion that plaintiffs have failed to establish their prima facie case, Thompson's testimony regarding future earnings is unnecessary.

Accordingly, the court hereby grants defendant's motion to exclude expert testimony.[13]

---

[12]  Mann's brief discussion of facts assumes that defendant required plaintiffs to falsify their Whaley Statements.

[13]  In light of this holding, the court need not address defendant's other grounds for its motion.

### III.    Conclusion

For the foregoing reasons, the court hereby **GRANTS** defendant's motion for summary judgment [37] and defendant's motion to exclude expert testimony [28]. The clerk is hereby **DIRECTED** to **ENTER** judgment for defendant and against plaintiffs.

**SO ORDERED**, this 28th day of June, 2017.

_____
**RICHARD W. STORY**
United States District Judge

34